RONALD J. TENPAS
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

PHILLIP A. BROOKS
JUSTIN A. SAVAGE
Environmental Enforcement Section
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611
Ph. (202) 514-3637; fax (202) 616-6583

STEVEN W. MYHRE
Acting United States Attorney
District of Nevada
BLAINE T. WELSH (Bar No. 4790)
333 Las Vegas Blvd. South, Suite 5000
Las Vegas, Nevada 89101
Ph. (702) 388-6336; fax (702) 388-6787

Attorneys for Plaintiff United States of America

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

UNITED STATES OF AMERICA,

Plaintiff,

v.

NEVADA POWER COMPANY

Defendant.

Case No: 2:07-cv-00771-LDG-GWF

CONSENT DECREE

TABLE OF CONTENTS

I. JURISDICTION AND VENUE 4
II. APPLICABILITY 4
III. DEFINITIONS 5
IV. $NO_x$ EMISSION REDUCTIONS AND CONTROLS 8
A. Interim $NO_x$ Emissions Reductions 8
B. $NO_x$ Emissions Reductions and Controls 9
C. Tonnage Limits for $NO_x$ Emissions 12
D. Use of $NO_x$ Emission Allowances 12
V. PROHIBITION ON NETTING CREDITS OR OFFSETS FROM REQUIRED CONTROLS 14
VI. ENVIRONMENTAL PROJECT 14
VII. CIVIL PENALTY 16
VIII. RESOLUTION OF CLAIMS 17
IX. PERIODIC REPORTING 18
X. REVIEW AND APPROVAL OF SUBMITTALS 20
XI. STIPULATED PENALTIES 21
XII. FORCE MAJEURE 25
XIII. DISPUTE RESOLUTION 28
XIV. PERMITS 30
XV. INFORMATION COLLECTION AND RETENTION 32
XVI. NOTICES 33
XVII. SALES OR TRANSFERS OF OWNERSHIP INTERESTS 36
XVIII. EFFECTIVE DATE 38
XIX. RETENTION OF JURISDICTION 38
XX. MODIFICATION 38
XXI. GENERAL PROVISIONS 38
XXII. SIGNATORIES AND SERVICE 41
XXIII. PUBLIC COMMENT 41
XXIV. CONDITIONAL TERMINATION OF ENFORCEMENT 41
XXV. FINAL JUDGMENT 43

WHEREAS, on June 13, 2007, the United States of America ("the United States"), on behalf of the United States Environmental Protection Agency ("EPA"), filed a Complaint against Nevada Power Company ("Nevada Power") pursuant to Sections 113(b)(2) and 167 of the Clean Air Act (the "Act"), 42 U.S.C. §§ 7413(b)(2) and 7477, for injunctive relief and the assessment of civil penalties for alleged violations of:

(a) the Prevention of Significant Deterioration provisions of Part C of Subchapter I of the Act, 42 U.S.C. §§ 7470-7492;

(b) the federally enforceable State Implementation Plan of Clark County, Nevada ("SIP" or "Clark County SIP"); and

(c) the operating permit program established by Title V of the Act, 42 U.S.C. §§ 7661-7661f, and the federally enforceable operating permit regulations of Clark County, Nevada;

WHEREAS, in its Complaint, the United States alleges, *inter alia,* that Nevada Power failed to obtain the necessary permits and install the controls necessary under the Act to reduce its nitrogen oxide ("$NO_x$") emissions, and that such emissions can damage human health and the environment;

WHEREAS, the Complaint alleges claims upon which relief can be granted against Nevada Power under Sections 113 and 167 of the Act, 42 U.S.C. §§ 7413 and 7477;

WHEREAS, Nevada Power has not answered or otherwise responded to the Complaint in light of the settlement memorialized in this Consent Decree;

WHEREAS, the United States provided Nevada Power, the State of Nevada, and Clark County, Nevada with actual notice of alleged violations in accordance with Section 113(a)(1) of the Act, 42 U.S.C. § 7413(a)(1);

WHEREAS, Nevada Power denies the violations alleged in the Complaint, denies any liability under the Complaint, maintains that it has been and remains in full compliance with the Act and the Clark County SIP, and is not liable for civil penalties, injunctive relief, or any other relief, and Nevada Power is agreeing to the obligations imposed by this Consent Decree to reduce emissions, improve air quality, benefit the environment, and avoid the costs of litigation, as well as to employ an advanced low $NO_x$ burner technology;

WHEREAS, the United States and Nevada Power (collectively the "Parties") understand that Units 5 through 8 and the associated Heat Recovery Steam Generators at Nevada Power's Clark Generating Station are "Electric Utility Steam Generating Units," as that term is defined under Section 0 of the Clark County Air Quality Regulations ("CCAQR");

WHEREAS, the definition of "Actual Emissions" in Section 0 of the CCAQR provides, in relevant part, that "For an Electric Utility Steam Generating Unit (other than a new unit or replacement of an existing unit) Actual Emissions of the unit following the physical or operational change shall equal the representative Actual Emissions of the unit";

WHEREAS, the term "Modification" in Sections 0 and 12 of the CCAQR cross-references the definition of "Net Emission Increase," in Section 0, which in turn is defined by certain increases and decreases in "Actual Emissions";

WHEREAS, EPA approved the above-referenced parts of Sections 0 and 12 of the CCAQR as part of the Clark County SIP, effective October 7, 2004, 69 Fed. Reg. 54,006 (2004) (codified at 40 C.F.R. § 52.1470(c)(53)(i)(A)(1));

WHEREAS, Nevada Power has cooperated in the resolution of this dispute;

WHEREAS, the Parties have agreed, and the Court by entering the Consent Decree,

finds: that this Consent Decree has been negotiated in good faith and at arms length; that the settlement is fair, reasonable, in the best interest of the Parties and in the public interest; that the settlement is consistent with the goals of the Act; that the entry of the Consent Decree without litigation is the most appropriate means of resolving this matter;

WHEREAS, the Parties have consented to entry of this Consent Decree without trial of any issues;

NOW, THEREFORE, without any admission of fact or law, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction over this action, the subject matter herein, and the Parties pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and 1367, and pursuant to Sections 113 and 167 of the Act, 42 U.S.C. §§ 7413 and 7477.  Venue is proper under Section 113(b) of the Act, 42 U.S.C. § 7413(b), and under 28 U.S.C. § 1391(b) and (c).  Solely for the purposes of this Consent Decree and the underlying Complaint, Nevada Power waives all objections and defenses that it may have to the Court's jurisdiction over Nevada Power and this action, and to venue in this District.  Nevada Power shall not challenge the terms of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree.  Except as expressly provided for herein, this Consent Decree shall not create any rights in any party other than the Parties to this Consent Decree.  Except as provided in Section XXIII (Public Comment) of this Consent Decree, the Parties consent to entry of this Consent Decree without further notice.

## II. APPLICABILITY

2. Upon entry, the provisions of this Consent Decree shall apply to and be binding upon the United States, Nevada Power, its successors and assigns, and upon Nevada Power's officers,

employees and agents solely in their capacities as such.

3. Nevada Power shall provide a copy of this Consent Decree to all vendors, suppliers, consultants, contractors, agents, and any other company or other organization retained to perform any of the work required by this Consent Decree. Notwithstanding any retention of contractors, subcontractors, or agents to perform any work required under this Consent Decree, Nevada Power shall be responsible for ensuring that all work is performed in accordance with the requirements of this Consent Decree. In any action to enforce this Consent Decree, Nevada Power shall not assert as a defense the failure of its officers, directors, employees, servants, agents, or contractors to take actions necessary to comply with this Consent Decree, unless it is determined to be a Force Majeure Event and satisfies the Force Majeure provisions (Section XII) of this Consent Decree.

## III. DEFINITIONS

4. "Automatic Safety or Equipment Protection Systems" means the systems that automatically change certain operating parameters at the Clark Station in order to protect Clark Station personnel or equipment from injury or damage. The systems consist of sensors that monitor key parameters (including, for example, temperature, pressure, flow rates, and valve positions) for numerous components at the Clark Generating Station, and when one or more of these key parameters is found to be outside of the manufacturer's recommended tolerances, an automatic change to one or more of the Covered Units' operations may be triggered.

5. "CEMS" or "Continuous Emission Monitoring System," means, for obligations involving $NO_x$ under this Consent Decree, the devices defined in 40 C.F.R. Part 60, and installed and maintained as required by 40 C.F.R. Part 60.

6. "Clark Station" means Clark Generating Station located in Las Vegas, Nevada.

7. "Clean Air Act" or "Act" means the federal Clean Air Act, 42 U.S.C. §§7401-7671q, and its implementing regulations.

8. "Cold Steam Turbine Start-up" means the start-up of a power block when the steam turbine first stage base metal temperatures are below 250°F.

9. "Consent Decree" or "Decree" means this Consent Decree.

10. "Covered Units" means Units 5, 6, 7, and 8 at Clark Station, regardless of whether such units are operating in simple cycle mode or combined cycle mode. "Covered Unit" means one of the Covered Units, as specified in this Consent Decree.

11. "EPA" means the United States Environmental Protection Agency.

12. "Netting" shall mean the process of determining whether a particular physical change or change in the method of operation of a major stationary source results in a net emissions increase, as that term is defined at 40 C.F.R. § 52.21(b)(3)(i) and Section 0 of the Clark County Air Quality Regulations (2004).

13. "Nevada Power" means Nevada Power Company.

14. "$NO_x$" means oxides of nitrogen, measured in accordance with the provisions of this Consent Decree.

15. "$NO_x$ Allowance(s)" means an authorization or credit to emit a specified amount of

$NO_x$ that is allocated or issued under an emissions trading or marketable permit program of any kind established under the Act or a State Implementation Plan.

16. "$NO_x$ Emission Rate" means the average concentration of $NO_x$ in parts per million by volume ("ppm").

17. "$NO_x$ Tonnage for One Calendar Year" means the sum of the tons of $NO_x$ emitted from Covered Units, as specified in this Consent Decree, in any 12-Month calendar year (*i.e.*, from January 1 through December 31). A new $NO_x$ Tonnage for One Calendar Year shall be calculated for each new calendar year. The calculation of each $NO_x$ Tonnage for One Calendar Year shall include the pollutants emitted during all periods of operation during each calendar year, including, without limitation, Start-up and Shut Down.

18. "Parties" means the United States of America and Nevada Power. "Party" means one of the two named "Parties."

19. "Plaintiff" means the United States of America.

20. "ppm" means parts per million by dry volume, corrected to 15% $O_2$.

21. "Prevention of Significant Deterioration" or "PSD" means the prevention of significant deterioration of air quality program under Part C of Subchapter I of the Clean Air Act, 42 U.S.C. §§ 7470 - 7492, and 40 C.F.R. Part 52.

22. "Project Dollars" means Nevada Power's expenditures and payments incurred or made in carrying out the Projects identified in Section VI (Environmental Project) of this Consent Decree to the extent that such expenditures or payments both: (a) comply with the requirements set forth in Section VI (Environmental Project) of this Consent Decree; and (b) constitute (i) Nevada Power's direct payments for such projects, (ii) Nevada Power's external

costs for contractors, vendors, and equipment, (iii) Nevada Power's internal costs consisting of

employee time, travel, or out-of-pocket expenses specifically attributable to these particular

projects and documented in accordance with Generally Accepted Accounting Principles

("GAAP"), or (iv) the discounted present value of the cash payments made by Nevada Power

under a contract with another entity to carry out the project.

23.  "Shut Down" means the period of no more than one hour that immediately precedes
the cessation of fuel combustion.

24.  "Start-up" means the one-hour period immediately following the beginning of the

combustion of fuel, except during a Cold Steam Turbine Start-up of a Covered Unit operating in

combined cycle mode.  During such a cold steam start-up, "Start-up" means the two hour period

immediately following the beginning of the combustion of fuel in the first Covered Unit to start

in that power block.

25.  "Title V Permit" means the operating permit required of Nevada Power for Clark

Station under Subchapter V of the Act, 42 U.S.C. §§ 7661-7661e.

26.  "ULNB" means ultra low $NO_x$ burners.

## IV.  $NO_x$ EMISSION REDUCTIONS AND CONTROLS

### A.  Interim $NO_x$ Emissions Reductions

27.  Pending the installation of ultra low $NO_X$ burners ("ULNBs") on Clark Station Units

5 through 8, as provided in Section IV.B. of this Decree, the Parties intend for Nevada Power to

reduce $NO_x$ emissions from these Covered Units by employing increased water injection on each

Unit, as specified in this Section.

28.  Within thirty (30) calendar days of lodging of this Consent Decree, Nevada Power

shall begin to operate Units 5, 6, 7, and 8 in accordance with the water-to-fuel ratio curves ("water injection curves") attached to and incorporated into this Consent Decree as Appendix 1, excluding only periods of Start-up and Shut Down. Nevada Power shall record, using the Covered Units' CEMS Data Acquisition and Handling System ("DAHS"), or its replacement system, the actual water to fuel ratio on a 3-hour average basis, and shall compare these values with the water injection curves (also computed on a 3-hour average basis) to determine compliance. When Nevada Power begins the operation of a ULNB on a Covered Unit, as provided in Section IV.B. of this Decree, Nevada Power shall cease operating water injection on that Covered Unit and shall thereafter have no obligation to operate water injection on that Covered Unit, including in accordance with the water injection curves established above.

**B. $NO_x$ Emissions Reductions and Controls**

29. Nevada Power shall install and commence operation of ULNBs (or equivalent $NO_x$ control technology approved pursuant to Paragraph 30), and achieve a $NO_x$ Emission Rate not greater than 5 ppm, as averaged over 1 hour ("1-hour average"), on the Covered Units by the dates set forth in the following table:

| Unit | Date by Which Nevada Power Must Complete Installation and Commence Operation of ULNB | Date by Which Nevada Power Must Comply with the 5 ppm $NO_x$ Emission Rate on a 1-hour average |
|---|---|---|
| Clark Station Unit 5 | December 31, 2008 | January 30, 2009 |
| Clark Station Unit 8 | December 31, 2008 | January 30, 2009 |
| Clark Station Unit 6 | December 31, 2009 | January 30, 2010 |
| Clark Station Unit 7 | December 31, 2009 | January 30, 2010 |

30. With prior written notice to and approval from EPA, Nevada Power may, in lieu of installing and operating any such ULNB on a Covered Unit, install and operate equivalent $NO_x$

control technology on a Covered Unit, so long as the technology achieves a $NO_x$ Emission Rate not greater than 5 ppm on a 1-hour average.

31. In determining the 5 ppm $NO_x$ Emission Rate on a 1-hour average, required under Paragraphs 29-30, Nevada Power shall use CEMS in accordance with the applicable reference methods specified in 40 C.F.R. Part 60 to calculate emissions for each 15 minute interval within each clock hour, except as provided in this Paragraph. Compliance with the 5 ppm $NO_x$ Emission Rate required under Paragraphs 29-30 shall be shown by averaging all 15-minute CEMS interval readings within a clock hour, except that any 15-minute CEMS interval that contains any part of a Start-up or Shut Down shall not be included in the calculation of that 1-hour average. A minimum of two 15-minute CEMS interval readings within a clock hour, not including Start-up or Shut Down intervals, is required to determine compliance with the 5 ppm $NO_x$ Emission Rate, on a 1-hour average, required under Paragraphs 29-30. All emissions recorded by CEMS shall be reported in one hour averages.

32. The 1-hour averaging set forth in Paragraph 31 shall also be used to determine the stipulated penalties for ppm $NO_x$ violations specified in Paragraph 67.

33. After entry of this Consent Decree, Nevada Power shall combust only natural gas in the Covered Units.

34. The 5 ppm $NO_x$ Emission Rate required under Paragraphs 29-30 shall apply during all periods of operation except Start-up, Shut Down, and as provided in Paragraphs 35-36 of this Consent Decree.

35. The 5 ppm $NO_x$ Emission Rate shall not apply to a 1-hour average $NO_x$ emissions above 5 ppm $NO_x$ at a Covered Unit, if all of the conditions of the following Subparagraphs a-e

of this Paragraph of this Decree are met:

    a.    The Covered Unit operates under any one of the following conditions:

        (1) Rapid combustion turbine load changes due to activation of the Automatic Safety or Equipment Protection Systems which rapidly decreases turbine load; or

        (2)  A change in the combustion mode of the ULNBs triggered by the Automatic Safety or Equipment Protection Systems.

    b.    The 1-hour average $NO_x$ emissions above the 5 ppm $NO_x$ Emission Rate did not occur as a result of operator neglect; improper operation or maintenance; or the tampering with, interfering with, altering, or adjusting any equipment in any way which conceals or disguises the type and quantity of emissions.

    c.    The operating conditions described in Paragraph 35.a of this Decree are recorded in the plant's operating log within 24 hours of the event, and in the CEMS by 5 p.m. the next business day following the event.  The notations in the log and CEMS must describe the data, list the time of entry into the log, and describe the plant operating conditions responsible for the event.

    d.    The 1-hour average $NO_x$ concentration does not exceed 32 ppm, when calculated as required by Paragraph 31 of this Decree.

    e.    Within thirty (30) calendar days of the event, Nevada Power files a report with the EPA and the Department of Justice that sets forth the information that demonstrates the applicability of Subparagraphs a-e of this Paragraph to the event.

36. Paragraph 35 may apply to no more than ten (10) 1-hour averages of $NO_x$ emissions per

Covered Unit per calendar year, and it is Nevada Power's burden to demonstrate that it has met the conditions of Paragraph 35.a through e. All $NO_x$ emissions during these 1-hour periods covered by Paragraph 35 shall be included when calculating the $NO_x$ Tonnage for One Calendar Year.

37. Nevada Power shall, to the extent practicable, maintain and operate the Covered Units in a manner consistent with good air pollution control practices for minimizing emissions, including during Start-up and Shut Down.

**C. Tonnage Limits for $NO_x$ Emissions**

38. Nevada Power shall comply with the following limits on the $NO_x$ Tonnage for One Calendar Year for the Covered Units at Clark Station, as specified below:

    a.    For the calendar year 2009 only, beginning January 1, 2009, Nevada Power shall not emit $NO_x$ from Units 5 and 8 at Clark Station in an amount greater than 180 tons per year, based upon a $NO_x$ Tonnage for One Calendar Year; and

    b.    Beginning January 1, 2010, Nevada Power shall not emit $NO_x$ from Units 5, 6, 7, and 8 at Clark Station in an amount greater than 360 tons per year, based upon a $NO_x$ Tonnage for One Calendar Year.

39. Nevada Power shall not use $NO_x$ Allowances to comply with the $NO_x$ tonnage limitations set forth in Paragraph 38.

**D. Use of $NO_x$ Emission Allowances**

40. Except as provided in this Consent Decree, Nevada Power shall not use, sell, or trade $NO_x$ Allowances that would have otherwise been available for use, sale, or trade as a result of

actions taken by Nevada Power to comply with the requirements of this Consent Decree.

41. Provided that Nevada Power is in compliance with the $NO_x$ emission limitations of this Consent Decree, nothing in this Consent Decree shall preclude Nevada Power from using, selling or transferring surplus $NO_x$ Allowances that may arise as a result of:

a. Activities that reduce $NO_x$ emissions from Covered Units prior to the date of entry of this Consent Decree, except for the Interim $NO_x$ Reductions required under Section IV.A;

b. Achievement and maintenance of the $NO_x$ Emission Rates at Covered Units below the emission limits required by Section IV.B ($NO_x$ Emissions Reductions and Controls); and

c. Other emission reduction measures that are agreed to by the Parties and made enforceable through modifications of this Consent Decree;

so long as Nevada Power timely reports the generation of such surplus $NO_x$ Allowances in accordance with Section IX (Periodic Reporting) of this Consent Decree. For purposes of this Paragraph, surplus $NO_x$ Allowances equal the number of tons of $NO_x$ that Nevada Power removed from its emissions that are in excess of the $NO_x$ reductions required by this Consent Decree.

42. Nevada Power may not purchase or otherwise obtain $NO_x$ Allowances from another source for purposes of complying with the requirements of this Consent Decree. However, nothing in this Consent Decree shall prevent Nevada Power from purchasing or otherwise obtaining $NO_x$ Allowances from another source for purposes of complying with state or federal Clean Air Act requirements to the extent otherwise allowed by law.

## V. PROHIBITION ON NETTING CREDITS OR OFFSETS FROM REQUIRED CONTROLS

43. For any and all actions taken by Nevada Power to comply with the requirements of this Consent Decree, including but not limited to increased water injection, the installation of the ULNBs, and the reduction of emissions to satisfy the annual tonnage limitations, any emission reductions shall not be considered a creditable contemporaneous emission decrease for the purpose of obtaining a netting credit under the Clean Air Act's Nonattainment NSR and PSD programs.

44. The limitations on the generation and use of netting credits or offsets set forth in the previous Paragraph do not apply to emission reduction measures that qualify as surplus $NO_x$ Allowances under Paragraph 41.

45. Nothing in this Consent Decree is intended to preclude the emission reductions generated under this Consent Decree from being considered by the State of Nevada, Clark County, Nevada, and EPA as creditable emission decreases for the purpose of attainment demonstrations submitted pursuant to Section 110 of the Act, 42 U.S.C. § 7410, or in determining impacts on National Ambient Air Quality Standards or PSD increment consumption.

## VI. ENVIRONMENTAL PROJECT

46. Nevada Power shall implement a Project ("Project") to install photovoltaic arrays on a building in Las Vegas, Nevada. The Project is further described below and in Appendix 2, which is attached and incorporated into this Decree.

47. To implement the Project, Nevada Power shall spend no less than $400,000 in funds ("Project Dollars"). Nevada Power shall maintain all documents to substantiate the Project Dollars expended and shall provide these documents to the United States within sixty (60)

calendar days of a request by the United States for the documents.

48. Nevada Power hereby certifies that, as of the date of this Consent Decree, Nevada Power is not otherwise required by law to perform the Project described in the Decree, that Nevada Power is unaware of any other person who is required by law to perform the Project, and that Nevada Power will not use the Project, or portion thereof, to satisfy any obligations that it may have under other applicable requirements of law. Nevada Power shall make this certification in the progress and completion reports respectively required by Paragraphs 55 and 52 of this Consent Decree.

49. Nevada Power shall use good faith efforts to secure as much benefit as possible for the Project Dollars expended.

50. Regardless of whether Nevada Power elected (where such election is allowed) to undertake the Project by itself or to do so by contributing funds to another person or instrumentality that will carry out the Project, Nevada Power acknowledges that it will receive credit for the expenditure of such funds as Project Dollars only if Nevada Power demonstrates that the funds have been actually spent by either Nevada Power or by the person or instrumentality receiving them (or, in the case of internal costs, have actually been incurred by Nevada Power), and that such expenditures meet all requirements of this Consent Decree.

51. Nevada Power shall receive full credit for the expenditure of Project Dollars only to the extent that Nevada Power does not receive an offsetting financial or economic benefit from such expenditures, including, without limitation: any tax rebate, credit, or deduction under the Internal Revenue Code or any other applicable federal, state, or local law; any grants under federal, state, or local law; and any proceeds of sales of electricity from the solar arrays to the local electric grid, if any. In determining how many Project Dollars have been spent by Nevada

Power, Nevada Power shall debit offsetting financial or economic benefits, if any, received against any of Nevada Power's expenditures for the Project.

52. Within sixty (60) calendar days following the completion of the Project required under this Consent Decree, Nevada Power shall submit to the United States a report that documents the date that the Project was completed, the results of implementing the Project, including Nevada Power's estimate of the emission reductions or other environmental benefits achieved, and the Project Dollars expended by Nevada Power in implementing the Project. Nevada Power will post a copy of this report on the company's website.

53. Nevada Power shall not financially benefit to a greater extent than any other member of the general public from the Project.

54. Project Dollar credit given for the Project shall reflect Nevada Power's net cost in implementing the Project, and any economic benefit or income resulting from the Project shall be deducted from the Project Dollar credit given to the Project.

55. Nevada Power shall provide the United States with updates concerning the progress of the Project as part of its regular progress reports under Section IX of this Decree, until such time as the Project is completed.

## VII. CIVIL PENALTY

56. Within thirty (30) calendar days after entry of this Consent Decree, Nevada Power shall pay to the United States a civil penalty in the amount of $300,000. The civil penalty shall be paid by Electronic Funds Transfer ("EFT") to the United States Department of Justice, in accordance with current EFT procedures, referencing USAO File Number 2003V00045 and DOJ Case Number 90-5-2-1-07969 and the civil action case name and case number of this action.

The costs of such EFT shall be Nevada Power's responsibility.  Payment shall be made in accordance with instructions provided to Nevada Power by the Financial Litigation Unit of the U.S. Attorney's Office for the District of Nevada.  Any funds received after 2:00 p.m. EDT shall be credited on the next business day.  At the time of payment, Nevada Power shall provide notice of payment, referencing the USAO File Number, the DOJ Case Number, and the civil action case name and case number, to the Department of Justice and to EPA in accordance with Section XVI (Notices) of this Consent Decree.

57.  Failure to timely pay the civil penalty shall subject Nevada Power to interest accruing from the date payment is due until the date payment is made at the rate prescribed by 28 U.S.C. § 1961, and shall render Nevada Power liable for all charges, costs, fees, and penalties established by law for the benefit of a creditor or of the United States in securing payment.

58.  Payments made pursuant to this Section are penalties within the meaning of Section 162(f) of the Internal Revenue Code, 26 U.S.C. § 162(f), and are not tax-deductible expenditures for purposes of federal law.

## VIII.  RESOLUTION OF CLAIMS

59.  Entry of this Consent Decree shall resolve all civil claims of the United States under:

a.      Parts C and D of Subchapter I of the Clean Air Act and implementing regulations, including 40 C.F.R. Parts 51 and 52;

b.      Section 111 of the Clean Air Act and 40 C.F.R. Part 60;

c.      The federally approved and enforceable Nevada State Implementation Plan;

d.      Sections 502(a) and 504(a) of the Clean Air Act but only to the extent that such claims are based on Nevada Power's failure to obtain an operating permit

that reflects applicable requirements imposed under Part C or D of Subchapter I, or Section 111 of the Clean Air Act; and

e. Section 12 of the Clark County Air Quality Regulations and all relevant prior versions of these Regulations, including without limitation Section 15 (Source Registration) and Section 16 (Operating Permits) of the Clark County Air Quality Regulations in effect before 2000;

that arose from any modification that commenced at Covered Units before the date of lodging of this Consent Decree, including but not limited to modifications alleged in the Notice of Violation issued by EPA concerning the Covered Units dated October 29, 2003, and in the Complaint filed by the United States in this civil action; provided, however, that this Paragraph shall be deemed to extend to increased water injection of the Covered Units in accordance with Section IV.A. of this Consent Decree (Interim $NO_x$ Emissions Reductions).

## IX. PERIODIC REPORTING

60. Beginning thirty (30) calendar days after the end of the first full calendar quarter following the entry of this Consent Decree, continuing on a semi-annual basis until December 31, 2013, and in addition to any other express reporting requirement in this Consent Decree, Nevada Power shall submit to EPA a progress report, containing:

a. All information necessary to determine compliance with this Consent Decree, including but not limited to information required to be included in the reports pursuant to Paragraphs 41 and 55; and

b. All information indicating that the installation and commencement of operation of equipment under Section IV.A or IV.B may be delayed, including the nature and cause of the delay, and any steps taken by Nevada Power to mitigate

such delay.

61.  In any periodic progress report submitted pursuant to this Section, Nevada Power may incorporate by reference information previously submitted under their Title V permitting requirements, provided that Nevada Power attaches the Title V permit report (or pertinent portions of such report) and provide a specific reference to the provisions of the Title V permit report that are responsive to the information required in the periodic progress report.

62.  On September 1 of any calendar year in which the Tonnage Limits on $NO_x$ Emissions of Section IV.C of this Consent Decree are in effect, Nevada Power shall calculate, as specified below, the tons per year of $NO_x$ emitted from Covered Units since January 1 of the same calendar year; provided, however, that the calculations need only be prepared for Covered Units then subject to the Tonnage Limits on $NO_x$ Emissions of Section IV.C (for example, the $NO_x$ emissions from a Covered Unit not yet controlled with an UNLB need not be calculated). Nevada Power shall repeat the calculation on the first of each month through the end of the calendar year, except that if $NO_x$ emissions from Covered Units are within 5% of any Tonnage Limits on $NO_x$ Emissions of Section IV.C, Nevada Power shall prepare weekly calculations. Records of the calculations required by this Paragraph shall be kept.  The record of the calculations required by this Paragraph shall be made available to EPA within fourteen (14) calendar days of receipt of a written request to Nevada Power.  In addition, if the calculation required by this Paragraph shows that the $NO_x$ emissions from Covered Units are within 5% of any Tonnage Limits on $NO_x$ Emissions of Section IV.C, Nevada Power shall report that fact to EPA in writing within fourteen (14) calendar days of such calculation.  In this report, Nevada Power shall explain all measures taken or to be taken by Nevada Power to prevent a violation of the Tonnage Limits on $NO_x$ Emissions of Section IV.C.

63. In addition to the progress reports required pursuant to this Section, Nevada Power shall provide a written report to Plaintiff of any violation of the requirements of this Consent Decree, including failure to comply with the deadlines in Section IV, and any exceedances of the water injection curves, the $NO_x$ Emission Rates and Tonnage Limits on $NO_x$ Emissions specified in Section IV, within fourteen (14) calendar days of when Nevada Power knew or should have known of any such violations. In this report, Nevada Power shall explain the cause or causes of the violations and all measures taken or to be taken by Nevada Power to prevent such violations in the future.

64. Each Nevada Power report shall be signed by Nevada Power's Environmental Manager or, in his or her absence, Nevada Power's Vice President of Generation, or higher ranking official, and shall contain the following certification:

> This information was prepared either by me or under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my evaluation, or the direction and my inquiry of the person(s) who manage the system, or the person(s) directly responsible for gathering the information, I hereby certify under penalty of law that, to the best of my knowledge and belief, this information is true, accurate, and complete. I understand that there are significant penalties for submitting false, inaccurate, or incomplete information to the United States.

## X. REVIEW AND APPROVAL OF SUBMITTALS

65. Nevada Power shall submit each plan, report, or other submission to EPA whenever such a document is required to be submitted for review or approval pursuant to this Consent Decree. EPA may approve the submittal or decline to approve it and provide written comments. Within sixty (60) calendar days of receiving written comments from EPA, Nevada Power shall either: (a) revise the submittal consistent with the written comments and provide the revised submittal for final approval to EPA; or (b) submit the matter for dispute resolution, including the

period of informal negotiations, under Section XIII (Dispute Resolution) of this Consent Decree.

66.  Upon receipt of EPA's final approval of the submittal, or upon completion of the submittal pursuant to dispute resolution, Nevada Power shall implement the approved submittal in accordance with the schedule specified therein.

## XI.  STIPULATED PENALTIES

67.  For any failure by Nevada Power to comply with the terms of this Consent Decree, and subject to the provisions of Sections XII (Force Majeure) and XIII (Dispute Resolution) of this Consent Decree, Nevada Power shall pay, within thirty (30) calendar days after receipt of written demand to Nevada Power by the United States, the following stipulated penalties to the United States:

| Consent Decree Violation | Stipulated Penalty (Per violation, unless otherwise specified) |
|---|---|
| a.  Failure to pay the civil penalty as specified in Section VII (Civil Penalty) of this Consent Decree. | $10,000 per day |
| b.  Failure to comply with the water injection, as specified in Section IV.A., where the violation is equal to, or less than, 20% of the water to fuel ratios specified in Appendix 1 on a 3-hour average, | $400 |
| c.  Failure to comply with the water injection, as specified in Section IV.A., where the violation is greater than 20% of the water to fuel ratios specified in Appendix 1 on a 3-hour average. | $800 |

| | |
|---|---|
| d.  Failure to comply with the water injection, as specified in Section IV.A., where the violation is equal to, or less than, 20% of the water to fuel ratios specified in Appendix 1 on a 3-hour average and Nevada Power has exceeded such ratios more than 10 times during the calendar year. | $4,000 |
| e.  Failure to comply with the water injection, as specified in Section IV.A., where the violation is greater than 20% of the water to fuel ratios specified in Appendix 1 on a 3-hour average and Nevada Power has exceeded such ratios more than 10 times during the calendar year. | $10,000 |
| f.  Failure to comply with the 5 ppm $NO_x$ emission rate, as specified in Section IV.B, where the violation is equal to, or less than, 7.5 ppm on a 1-hour average. | $400 |
| g.  Failure to comply with the 5 ppm $NO_x$ emission rate, as specified in Section IV.B, where the violation is greater than 7.5 ppm on a 1-hour average. | $800 |
| h.  Failure to comply with the 5 ppm $NO_x$ emission rate, as specified in Section IV.B, where the violation is equal to, or less than 7.5 ppm on a 1-hour average and Nevada Power has exceeded the 5 ppm $NO_x$ emission rate more than 15 times during the existing calendar year. | $4,000 |
| i.  Failure to comply with the 5 ppm $NO_x$ emission rate, as specified in Section IV.B, where the violation is greater than 7.5 ppm on a 1-hour average and Nevada Power has exceeded the 5 ppm $NO_x$ emission rate more than 15 times during the existing calendar year. | $10,000 |
| j.  Failure to comply with the Tonnage Limits for $NO_x$ Emissions, as specified in Section IV.C. | $40,000 per ton per year |
| k.  Failure to install, commence operation, or continue operation of the ULNBs, or equivalent $NO_x$ control technology, on any Unit, as specified in Section IV.B. | $1,000 per day for the first 10 calendar days, $5,000 per day during the next 20 calendar days, $27,500 per day thereafter |
| l.  Failure to operate CEMS as required in Paragraph 31. | $1,000 per day |
| m.  Failure to apply for any permit required by this Consent Decree. | $1,000 per day |

| | |
|---|---|
| n. Failure to timely submit, modify, or implement, as approved, the reports, plans, studies, analyses, protocols, or other submittals required by this Consent Decree. | $750 per day during the first ten calendar days, $1,000 thereafter |
| o. Using, selling or transferring $NO_x$ Allowances except as permitted in Paragraphs 40-42. | The surrender of $NO_x$ Allowances in an amount equal to four times the number of $NO_x$ Allowances used, sold, or transferred in violation of this Consent Decree |
| p. Failure to undertake and complete any of the Projects in compliance with Section VI (Environmental Project) of this Consent Decree. | $1,000 per day during the first 30 calendar days, $5,000 thereafter |
| q. Any other violation of this Consent Decree. | $1,000 |

68. All stipulated penalties shall begin to accrue on the day after the performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases. Nothing in this Consent Decree shall prevent the simultaneous accrual of separate stipulated penalties for separate violations of this Consent Decree.

69. Nevada Power shall pay all stipulated penalties to the United States within thirty (30) calendar days of receipt by Nevada Power of a written demand to Nevada Power from the United States, and shall continue to make such payments every thirty (30) calendar days thereafter until the violation(s) no longer continues, unless Nevada Power elects within thirty (30) calendar days of receipt of written demand to Nevada Power from the United States to dispute the demand for stipulated penalties in accordance with the provisions in Section XIII (Dispute Resolution) of this Consent Decree.

70. Stipulated penalties shall continue to accrue as provided in Paragraph 68 during any

dispute, with interest on accrued stipulated penalties payable and calculated at the rate

established by the Secretary of the Treasury, pursuant to 28 U.S.C. § 1961, but need not be paid

until the following:

  a.    If the dispute is resolved by agreement, or by a decision of the United

  States' pursuant to Section XIII (Dispute Resolution) of this Consent Decree that

  is not appealed to the Court, accrued stipulated penalties agreed or determined to

  be owing, together with accrued interest, shall be paid within thirty (30) calendar

  days of the effective date of the agreement or of the receipt of Plaintiff's decision;

  b.    If the dispute is appealed to the Court, and Plaintiff prevails in whole or in

  part, Nevada Power shall, within sixty (60) calendar days of receipt of the

  Court's decision or order, pay all accrued stipulated penalties determined by the

  Court to be owing, together with accrued interest, except as provided in

  Subparagraph (c); or

  c.    If the Court's decision is appealed by any Party, Nevada Power shall,

  within fifteen (15) calendar days of receipt of the final appellate court decision

  pay all accrued stipulated penalties determined to be owing, together with accrued

  interest.

For purposes of this Paragraph, the accrued stipulated penalties agreed to by the Parties, or

determined by the United States through Dispute Resolution, to be owing may be less than the

stipulated penalty amounts set forth in Paragraph 67. Nevada Power need not pay any stipulated

penalties based on violations which they dispute and ultimately prevail under Section XIII

(Dispute Resolution) of this Consent Decree.

  71. All stipulated penalties shall be paid in the manner set forth in Section VII (Civil

Penalty) of this Consent Decree.

72. Should Nevada Power fail to pay stipulated penalties in compliance with the terms of this Consent Decree, the United States shall be entitled to collect interest on such penalties, as provided for in 28 U.S.C. § 1961.

73. The stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States by reason of Nevada Power's failure to comply with any requirement of this Consent Decree or applicable law, except that for any violation of the Act for which this Consent Decree provides for payment of a stipulated penalty, Nevada Power shall be allowed a credit for stipulated penalties paid against any statutory penalties also imposed for such violation. Notwithstanding any other provision of this Consent Decree, the United States may, in its unreviewable discretion, waive all or any part of any stipulated penalties which may have accrued pursuant to this Consent Decree.

## XII. FORCE MAJEURE

74. For purposes of this Consent Decree, a "Force Majeure Event" shall mean an event that has been or will be caused by circumstances beyond the control of Nevada Power, its contractors, or any entity controlled by Nevada Power that delays compliance with any provision of this Consent Decree or otherwise causes a violation of any provision of this Consent Decree despite Nevada Power's best efforts to fulfill the obligation. "Best efforts to fulfill the obligation" include using best efforts to anticipate any potential Force Majeure Event and to address the effects of any such event (a) as it is occurring and (b) after it has occurred, such that the delay or violation is minimized to the greatest extent possible.

75. **Notice of Force Majeure Events.** If any event occurs or has occurred that may delay compliance with or otherwise cause a violation of any obligation under this Consent

Decree, as to which Nevada Power intends to assert a claim of Force Majeure, Nevada Power shall notify the United States in writing as soon as practicable, but, unless otherwise agreed, in no event later than twenty (20) calendar days following the date that Nevada Power first knew, or by the exercise of due diligence should have known, that the event caused or may cause such delay or violation. In this notice, Nevada Power shall reference this Paragraph of this Consent Decree and describe the anticipated length of time that the delay or violation may persist, the cause or causes of the delay or violation, all measures taken or to be taken by Nevada Power to prevent or minimize the delay or violation, the schedule by which Nevada Power proposes to implement those measures, and Nevada Power's rationale for attributing a delay or violation to a Force Majeure Event. Nevada Power shall adopt all reasonable measures to avoid or minimize such delays or violations. Nevada Power shall be deemed to know of any circumstance which Nevada Power, its contractors, or any entity controlled by Nevada Power knew or should have known.

76. **Failure to Give Notice.** If Nevada Power fails to comply with the notice requirements in the preceding Paragraph, the United States may void Nevada Power's claim for Force Majeure as to the specific event for which Nevada Power has failed to comply with such notice requirement.

77. **Plaintiff's Response.** The United States shall notify Nevada Power in writing regarding Nevada Power's claim of Force Majeure within thirty (30) calendar days of receipt of the notice provided under Paragraph 75. If the United States agrees that a delay in performance has been or will be caused by a Force Majeure Event, the Parties shall stipulate to an extension of deadline(s) for performance of the affected compliance requirement(s) by a period equal to the delay actually caused by the event. In such circumstances, an appropriate modification shall be

made pursuant to Section XX (Modification) of this Consent Decree.

78. **Disagreement.** If the United States does not accept Nevada Power's claims of Force Majeure, or if the Parties cannot agree on the length of the delay actually caused by the Force Majeure Event, the matter shall be resolved in accordance with Section XIII (Dispute Resolution) of this Consent Decree.

79. **Burden of Proof.** In any dispute regarding Force Majeure, Nevada Power shall bear the burden of proving that any delay in performance or any other violation of any requirement of this Consent Decree was caused by or will be caused by a Force Majeure Event. Nevada Power shall also bear the burden of proving that Nevada Power gave the notice required by Paragraph 75 and the burden of proving the anticipated duration and extent of any delay(s) attributable to a Force Majeure Event. An extension of one compliance date based on a particular event may, but will not necessarily, result in an extension of a subsequent compliance date.

80. **Events Excluded.** Unanticipated or increased costs or expenses associated with the performance of Nevada Power's obligations under this Consent Decree shall not constitute a Force Majeure Event.

81. **Potential Force Majeure Events.** The Parties agree that, depending upon the circumstances related to an event and Nevada Power's response to such circumstances, the kinds of events listed below are among those that could qualify as Force Majeure Events within the meaning of this Section: construction, labor, or equipment delays; acts of God; acts of war or terrorism; and orders by a government official, government agency, or other regulatory body acting under and authorized by applicable law that directs Nevada Power to supply electricity in response to a system-wide (state-wide or regional) emergency. Depending upon the circumstances and Nevada Power's response to such circumstances, failure of a permitting

authority to issue a necessary permit in a timely fashion may constitute a Force Majeure Event where the failure of the permitting authority to act is beyond the control of Nevada Power and Nevada Power has taken all steps available to it to obtain the necessary permit, including, but not limited to:  submitting a complete permit application; responding to requests for additional information by the permitting authority in a timely fashion; and accepting lawful permit terms and conditions after expeditiously exhausting any legal rights to appeal terms and conditions imposed by the permitting authority, provided that Nevada Power shall not be precluded from asserting that a new Force Majeure Event has caused or may cause a new or additional delay in complying with the extended or modified schedule.

82.  As part of the resolution of any matter submitted to this Court under Section XIII (Dispute Resolution) of this Consent Decree regarding a claim of Force Majeure, the Parties by agreement, or this Court by order, may in appropriate circumstances extend or modify the schedule for completion of work under this Consent Decree to account for the delay in the work that occurred as a result of any delay agreed to by the United States or approved by the Court. Nevada Power shall be subject to stipulated penalties for their failure thereafter to complete the work in accordance with the extended or modified schedule, provided that Nevada Power shall not be precluded from asserting that a Force Majeure Event has caused or may cause a delay in complying with the extended or modified schedule.

## XIII.  DISPUTE RESOLUTION

83.  The dispute resolution procedure provided by this Section shall be available to resolve all disputes arising under this Consent Decree.

84.  The dispute resolution procedure required herein shall be invoked by one Party

giving written notice to the other Party advising of a dispute pursuant to this Section. The notice shall describe the nature of the dispute and shall state the noticing Party's position with regard to such dispute. The Party receiving such a notice shall acknowledge receipt of the notice, and the Parties in dispute shall expeditiously schedule a meeting to discuss the dispute informally not later than fourteen (14) calendar days following receipt of such notice.

85.   Disputes submitted to dispute resolution under this Section shall, in the first instance, be the subject of informal negotiations among the Parties. Such period of informal negotiations shall not extend beyond thirty (30) calendar days from the date of the first meeting among the Parties' representatives unless they agree in writing to shorten or extend this period. During the informal negotiations period, the Parties may also submit their dispute to a mutually-agreed-upon alternative dispute resolution ("ADR") forum if the Parties agree that the ADR activities can be completed within the 30-day informal negotiations period (or such longer period as the Parties may agree to in writing).

86.   If the disputing Parties are unable to reach agreement during the informal negotiation period, the United States shall provide Nevada Power with a written summary of its position regarding the dispute. The written position provided by the United States shall be considered binding unless, within forty-five (45) calendar days thereafter, Nevada Power seeks judicial resolution of the dispute by filing a petition with this Court. The Plaintiff may respond to the petition within forty-five (45) calendar days of filing.

87.   Where the nature of the dispute is such that a more timely resolution of the issue is required, the time periods set out in this Section may be shortened upon motion of one of the Parties to the dispute.

88.   This Court shall not draw any inferences nor establish any presumptions adverse to

any disputing Party as a result of invocation of this Section or the Parties' inability to reach agreement.

89. As part of the resolution of any dispute under this Section, in appropriate circumstances the Parties may agree, or this Court may order, an extension or modification of the schedule for the completion of the activities required under this Consent Decree to account for the delay that occurred as a result of dispute resolution. Nevada Power shall be subject to stipulated penalties for their failure thereafter to complete the work in accordance with the extended or modified schedule, provided that Nevada Power shall not be precluded from asserting that a Force Majeure Event has caused or may cause a delay in complying with the extended or modified schedule.

90. The Court shall decide all disputes pursuant to applicable principles of law for resolving such disputes. In their initial filings with the Court under Paragraph 86, the Parties shall state their respective positions as to the applicable standard of law for resolving the particular dispute.

## XIV. PERMITS

91. Unless expressly stated otherwise in this Consent Decree, in any instance where otherwise applicable law or this Consent Decree requires Nevada Power to secure a permit to authorize construction or operation of any device, including all preconstruction, construction, and operating permits required under Nevada or Clark County law, Nevada Power shall make such application in a timely manner. The United States will use its best efforts to expeditiously review all permit applications submitted by Nevada Power in order to meet the requirements of this Consent Decree.

92. Notwithstanding the previous Paragraph (Paragraph 91), this Consent Decree itself

shall not be construed to require Nevada Power to apply for or obtain a permit pursuant to the New Source Review requirements of Parts C and D of Title I of the Act for work required under Section IV ($NO_x$ Emission Reductions and Controls) of this Consent Decree.

93.  When permits are required, Nevada Power shall complete and submit applications for such permits to the appropriate authorities to allow sufficient time for all legally required processing and review of the permit request, including requests for additional information by the permitting authorities.  Any failure by Nevada Power to submit a timely permit application for Units 5, 6, 7, and 8 at Clark Station shall bar any use by Nevada Power of Section XII (Force Majeure) of this Consent Decree, where a Force Majeure claim is based on permitting delays.

94.  Notwithstanding the reference to the Title V Permit in this Consent Decree, the enforcement of the permit shall be in accordance with its own terms and the Act.  The Title V Permit shall not be enforceable under this Consent Decree, although any term or limit established by or under this Consent Decree shall be enforceable under this Consent Decree regardless of whether such term has or will become part of a Title V Permit, subject to the terms of Section XXIV (Conditional Termination of Enforcement Under Consent Decree) of this Consent Decree.

95.  Within one-hundred twenty (120) calendar days after entry of this Consent Decree, Nevada Power shall amend any applicable Title V Permit application, or apply for amendments of its Title V Permit, to include a schedule for all unit-specific and plant-specific performance, operational, maintenance, and control technology requirements established by Section IV ($NO_x$ Emission Reductions and Controls) of this Consent Decree including, but not limited to, $NO_x$ Emission Rates and $NO_x$ Tonnage Limits for One Calendar Year.

96.  Within one (1) year from the commencement of operation of each UNLB or other pollution control device to be installed on a Covered Unit under Section IV.B ($NO_x$ Emissions

Reductions and Controls) of this Consent Decree, Nevada Power shall apply to include the requirements and limitations enumerated in this Paragraph of this Consent Decree in either a federally enforceable permit (other than a Title V Permit) or amendments to the Clark County, Nevada State Implementation Plan ("SIP"). The permit or SIP amendment shall require compliance with the following: (a) the 5 ppm $NO_x$ Emission Rates for Units covered under this Decree, as specified in Section IV.B.; and (b) the $NO_x$ Tonnage Limits for One Calendar Year set forth in Section IV.C. of this Consent Decree; and (c) the recordkeeping and reporting requirements set forth in Paragraph 35.

97. Nevada Power shall provide the United States with a copy of each application for a federally enforceable permit or SIP amendment, as well as a copy of any permit proposed as a result of such application, to allow for timely participation in any public comment opportunity.

98. If Nevada Power sells or transfers to an entity unrelated to Nevada Power ("Third Party Purchaser") part or all of an ownership interest in a Covered Unit ("Ownership Interest"), Nevada Power shall comply with the requirements of Paragraphs 91 through 97 with regard to Covered Units prior to any such sale or transfer unless, following any such sale or transfer, Nevada Power remains the holder of the permit for such facility.

## XV. INFORMATION COLLECTION AND RETENTION

99. Any authorized representative of the Plaintiff, including their attorneys, contractors, and consultants, upon presentation of credentials, shall have a right of entry upon the premises of the Clark Station at any reasonable time for the purpose of:

a. Monitoring the progress of activities required under this Consent Decree;

b. Verifying any data or information submitted to the Plaintiff in accordance with the terms of this Consent Decree;

c. Obtaining samples and, upon request, splits of any samples taken by Nevada Power or its representatives, contractors, or consultants; and

d. Assessing Nevada Power's compliance with this Consent Decree.

100. Nevada Power shall retain, and instruct its contractors and agents to preserve, all non-identical copies of all records and documents (including records and documents in electronic form) now in their or their contractors' or agents' possession or control, and that directly relate to Nevada Power's performance of its obligations under this Consent Decree, until December 31, 2015. This record retention requirement shall apply regardless of any corporate document retention policy to the contrary.

101. All information and documents submitted by Nevada Power pursuant to this Consent Decree shall be subject to public disclosure based on requests under applicable law providing for such disclosure unless (a) the information and documents are subject to legal privileges or protection or (b) Nevada Power claims and substantiates in accordance with 40 C.F.R. Part 2 that the information and documents contain confidential business information.

102. Nothing in this Consent Decree shall limit the authority of the United States to conduct tests and inspections at Clark Station under Section 114 of the Act, 42 U.S.C. § 7414, or any other applicable federal or state laws, regulations or permits.

## XVI. NOTICES

103. Unless otherwise provided herein, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

As to the United States of America:

Chief, Environmental Enforcement Section

Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, D.C.  20044-7611
DOJ# 90-5-2-1-07717

and

Director, Air Enforcement Division
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
Ariel Rios Building [2242A]
1200 Pennsylvania Avenue, N.W.
Washington, DC  20460

and

U. S. EPA, Region 9
Director, Air Division (AIR-1)
U.S. Environmental Protection Agency
75 Hawthorne Street
San Francisco, CA 94105

As to Nevada Power:

David Buente
Samuel Boxerman
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005

William M. Clark
Generation Executive and Responsible Official
Nevada Power Company
6226 West Sahara Avenue
Las Vegas, NV 89151

and

Starla S. Lacy
Director, Environmental Services
Nevada Power Company
6226 West Sahara Avenue
Las Vegas, NV 89151

104. All notifications, communications or submissions made pursuant to this Section shall be sent either by: (a) overnight mail or delivery service; (b) certified or registered mail, return receipt requested; or (c) electronic transmission, unless the recipient is not able to review the transmission in electronic form; provided, however, that all notifications, communication or submissions to EPA Region 9 shall be made by electronic mail (r9.aeo@epa.gov or aldred.charles@epa.gov) or on CD, DVD or other media format approved by EPA Region 9. All notifications, communications and transmissions (a) sent by overnight, certified or registered mail shall be deemed submitted on the date they are postmarked, or (b) sent by overnight delivery service shall be deemed submitted on the date they are delivered to the delivery service. All notifications, communications, and submissions made by electronic means shall be electronically signed and certified, and shall be deemed submitted on the date that Nevada Power receives written acknowledgment of receipt of such transmission.

105. Any Party may change either the notice recipient or the address for providing notices to it by serving the other Parties with a notice setting forth such new notice recipient or address.

## XVII. SALES OR TRANSFERS OF OWNERSHIP INTERESTS

106. If Nevada Power proposes to sell or transfer part or all of their ownership interest in any of their real property or operations subject to this Consent Decree ("Ownership Interest") to an entity unrelated to Nevada Power ("Third Party Purchaser"), Nevada Power shall advise the Third Party Purchaser in writing of the existence of this Consent Decree prior to such sale or transfer, and shall send a copy of such written notification to the Plaintiff pursuant to Section XVI (Notices) at least sixty (60) calendar days before such proposed sale or transfer.

107. No sale or transfer of an Ownership Interest shall take place before the Third Party

Purchaser and the United States have executed, and the Court has approved, a modification pursuant to Section XX (Modification) of this Consent Decree making the Third Party Purchaser a party defendant to this Consent Decree and jointly and severally liable with Nevada Power for all the requirements of this Consent Decree that may be applicable to the transferred or purchased Ownership Interests, except as provided in Paragraph 109.

108. This Consent Decree shall not be construed to impede the transfer of any Ownership Interests between Nevada Power and any Third Party Purchaser as long the requirements of this Consent Decree are met. In addition, this Consent Decree shall not be construed to prohibit a contractual allocation–as between Nevada Power and any Third Party Purchaser of Ownership Interests–of the burdens of compliance with this Decree, provided that both Nevada Power and such Third Party Purchaser shall remain jointly and severally liable to Plaintiff for the obligations of the Decree applicable to the transferred or purchased Ownership Interests, except as provided in Paragraph 109.

109. If the United States agrees, the United States, Nevada Power, and the Third Party Purchaser that has become a party defendant to this Consent Decree pursuant to Paragraph 107 may execute a modification that relieves Nevada Power of its liability under this Consent Decree for, and makes the Third Party Purchaser liable for, all obligations and liabilities applicable to the purchased or transferred Ownership Interests. Notwithstanding the foregoing, however, Nevada Power may not assign, and may not be released from, any obligation under this Consent Decree that is not specific to the purchased or transferred Ownership Interests, including the obligations set forth in Sections VI (Environmental Project) and VII (Civil Penalty). Nevada Power may propose and the United States may agree to restrict the scope of joint and several liability of any purchaser or transferee for any obligations of this Consent Decree that are not

specific to the purchased or transferred Ownership Interests to the extent such obligations may be adequately separated in an enforceable manner.

## XVIII. EFFECTIVE DATE

110. The effective date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court.

## XIX. RETENTION OF JURISDICTION

111. **Continuing Jurisdiction.** The Court shall retain jurisdiction of this case after entry of this Consent Decree to enforce compliance with the terms and conditions of this Consent Decree and to take any action necessary or appropriate for its interpretation, construction, execution, modification, or adjudication of disputes. During the term of this Consent Decree, any Party to this Consent Decree may apply to the Court for any relief necessary to construe or effectuate this Consent Decree.

## XX. MODIFICATION

112. The terms of this Consent Decree may be modified only by a subsequent written agreement signed by all Parties. Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval by the Court.

## XXI. GENERAL PROVISIONS

113. This Consent Decree is not a permit. Compliance with the terms of this Consent Decree does not guarantee compliance with all applicable federal, state, or local laws or regulations. The $NO_x$ Emission Rates set forth herein do not relieve Nevada Power from any obligation to comply with other state and federal requirements under the Clean Air Act.

114. This Consent Decree does not apply to any claim(s) of alleged criminal liability.

115. In any subsequent administrative or judicial action initiated by the United States for injunctive relief or civil penalties relating to the Covered Units in this Consent Decree, Nevada Power shall not assert any defense or claim based upon principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, or claim splitting, or any other defense based upon the contention that the claims raised by the United States in the subsequent proceeding were brought, or should have been brought, in the instant case; provided, however, that nothing in this Paragraph is intended to, or shall, affect the validity of Section VIII (Resolution of Claims) of this Consent Decree.

116. Except as specifically provided by this Consent Decree, nothing in this Consent Decree shall relieve Nevada Power of their obligations to comply with all applicable federal, state, and local laws and regulations. Subject to the provisions in Section VIII (Resolution of Claims), nothing contained in this Consent Decree shall be construed to prevent or limit the rights of the United States to obtain penalties, injunctive relief or other relief under the Act or other federal, state, or local statutes, regulations, or permits.

117. Every term expressly defined by this Consent Decree shall have the meaning given to that term by this Consent Decree and, except as otherwise provided in this Consent Decree, every other term used in this Consent Decree that is also a term under the Act or the regulations implementing the Act shall mean in this Consent Decree what such term means under the Act or those implementing regulations.

118. Nothing in this Consent Decree is intended to, or shall, alter or waive any applicable law (including but not limited to any defenses, entitlements, challenges, or clarifications related to the Credible Evidence Rule, 62 Fed. Reg. 8315 (Feb. 27, 1997)) concerning the use of data for any purpose under the Act, generated either by the reference

methods specified herein or otherwise.

119.  Each limit and/or other requirement established by or under this Consent Decree is a separate, independent requirement.

120.  Performance standards, emissions limits, and other quantitative standards set by or under this Consent Decree must be met to the number of significant digits in which the standard or limit is expressed.  For example, an emission rate of 0.100 is not met if the actual emission rate is 0.101.  Nevada Power shall round the fourth significant digit to the nearest third significant digit, or the third significant digit to the nearest second significant digit, depending upon whether the limit is expressed to three or two significant digits.  For example, if an actual emission rate is 0.1004, that shall be reported as 0.100, and shall be in compliance with an emission rate of 0.100, and if an actual emission rate is 0.1005, that shall be reported as 0.101, and shall not be in compliance with an emission rate of 0.100.  Nevada Power shall report data to the number of significant digits in which the standard or limit is expressed.

121.  This Consent Decree does not limit, enlarge or affect the rights of any Party to this Consent Decree as against any third-parties.

122.  This Consent Decree constitutes the final, complete and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Consent Decree, and supersedes all prior agreements and understandings among the Parties related to the subject matter herein.  No document, representation, inducement, agreement, understanding, or promise constitutes any part of this Consent Decree or the settlement it represents, nor shall they be used in construing the terms of this Consent Decree.

123.  The United States and Nevada Power shall bear their own costs and attorneys' fees.

## XXII.  SIGNATORIES AND SERVICE

124.  Each undersigned representative of the Parties certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind to this document the Party he or she represents.

125.  This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect.

126.  Each Party hereby agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

## XXIII.  PUBLIC COMMENT

127.  The Parties agree and acknowledge that final approval by the United States and entry of this Consent Decree is subject to the procedures of 28 C.F.R. § 50.7, which provides for notice of the lodging of this Consent Decree in the Federal Register, an opportunity for public comment, and the right of the United States to withdraw or withhold consent if the comments disclose facts or considerations which indicate that the Consent Decree is inappropriate, improper or inadequate.  Nevada Power shall not oppose entry of this Consent Decree by this Court or challenge any provision of this Consent Decree unless the United States has notified Nevada Power, in writing, that the United States no longer supports entry of the Consent Decree.

## XXIV.  CONDITIONAL TERMINATION OF ENFORCEMENT UNDER CONSENT DECREE

128.  **Termination as to Completed Tasks.**  As soon as Nevada Power completes a construction project or any other requirement of this Consent Decree that is not ongoing or

recurring, Nevada Power may, by motion to this Court, seek termination of the provision or

provisions of this Consent Decree that imposed the requirement.

129. Conditional Termination of Enforcement Through the Consent Decree.  After

Nevada Power:

a.     has successfully completed construction, and has maintained operation, of the

ULNBs (Section IV.B of this Decree) or other pollution controls as required by

this Consent Decree;

b.     has obtained a revised Title V Permit  (i) as required by the terms of this Consent

Decree; (ii) that cover all Covered Units in this Consent Decree; and (iii) that

include as enforceable permit terms all of the unit performance and other

requirements specified in Paragraphs 95 and 96 of Section XIV (Permits) of this

Consent Decree; and

c.     certified that that the date is later than January 31, 2013;

then Nevada Power may so certify these facts to the United States and this Court.  If the United

States does not object in writing with specific reasons within forty-five (45) calendar days of

receipt of the Nevada Power's certification, then, for any Consent Decree violations that occur

after the filing of notice, the United States shall pursue enforcement of the requirements

contained in the Title V Permit through the applicable Title V Permit and not through this

Consent Decree.

130. **Resort to Enforcement under this Consent Decree.**  Notwithstanding Paragraph

129 if enforcement of a provision in this Consent Decree cannot be pursued by the United States

under the Title V Permit, or if a Consent Decree requirement was intended to be part of a Title V

Permit and did not become or remain part of such permit, then such requirement may be

enforced under the terms of this Consent Decree at any time, unless and until Nevada Power has secured a source specific revision to the Clark County, Nevada State Implementation Plan, as provided in Paragraph 96.

## XXV. FINAL JUDGMENT

131. Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment in the above-captioned matter between the Parties.

SO ORDERED, THIS 9 DAY OF Aug, 2007

UNITED STATES DISTRICT COURT JUDGE

**FOR THE UNITED STATES OF AMERICA:**

RONALD J. TENPAS
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

PHILLIP A. BROOKS
JUSTIN A. SAVAGE
Environmental Enforcement Section
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-3637
(202) 616-6583 (facsimile)

STEVEN W. MYHRE
Acting United States Attorney
District of Nevada

BLAINE T. WELSH (Bar No. 4790)
Civil Chief
333 Las Vegas Blvd. South, Suite 5000
Las Vegas, Nevada 89101
(702) 388-6336
(702) 388-6787 (facsimile)

**FOR THE UNITED STATES OF AMERICA:**

GRANTA Y. NAKAYAMA
Assistant Administrator
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

ADAM M. KUSHNER
Director, Air Enforcement Division
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

for

JEFFREY A. KODISH
Attorney Advisor
Air Enforcement Division
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

**FOR THE UNITED STATES OF AMERICA:**

for WAYNE NASTRI
Regional Administrator
U.S. Environmental Protection Agency
Region 9
San Francisco, CA 94105

IVAN LIEBEN
Enforcement Attorney
U.S. Environmental Protection Agency
Region 9
San Francisco, CA 94105

**FOR DEFENDANT NEVADA POWER COMPANY**

MICHAEL YACKIRA
President and Chief Operating Officer
Sierra Pacific Resources
6226 West Sahara Avenue
Las Vegas, Nevada 89146

**FOR DEFENDANT NEVADA POWER COMPANY**

DONALD . SHALMY
President, Nevada Power Company
6226 West Sahara Avenue
Las Vegas, Nevada 89146